**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HOOK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:21-CV-01251-SPM |
| | ) | |
| MICHELE BUCKNER, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the undersigned on the amended petition of Missouri state prisoner Robert Hook ("Petitioner") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 9).  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (ECF No. 12). For the following reasons, the petition will be denied.

**I.    FACTUAL BACKGROUND**

The Missouri Court of Appeals summarized the facts of Petitioner's case as follows:

> In July 2013, Victim was five years old and resided with her mother and father, Hook. Mother was incarcerated from July 8 through July 15, 2013. On July 11, 2013, Victim was staying with maternal grandmother, Mary Gibson ("Grandmother"). While in the shower, Victim (R.H.) asked Grandmother why she doesn't take a shower with her like Hook does. Grandmother did not respond and Victim did not say anything further about it that evening. The following morning, on July 12, 2013, Grandmother tried to talk to Victim about showering with Hook but Victim did not want to talk about it, said nothing happened, and went off to play. A couple hours later, Victim came to Grandmother and told her that she was ready to talk. Victim then told Grandmother, "daddy put his pee-pee in my pee-pee, and my butt, too." Victim told Grandmother that she was sure about what happened and that she was not lying. Later that same day, Grandmother took Victim to Boone

Convenient Care ("BCC") in Moberly where Victim was examined by Dr. Andrea Eden ("Dr. Eden"). Grandmother was present for the exam and Victim repeated her allegations to the doctor. Dr. Eden reported a possible sexual abuse to Child Protective Services ("CPS"). Afterwards, Victim and Grandmother returned to Grandmother's house. Later that day, Hook unexpectedly came to Grandmother's house and told Grandmother that the police wanted to talk to him. Victim then told Hook that she was sorry, that she told about "your pee-pee and my pee-pee," and gestured to his genital area and then to her own. The record is devoid of Hook's reaction to this statement by Victim.

Later that evening, Victim was placed in foster care with foster parents ("Foster Mother" and "Foster Father," respectively). The next morning, on July 13, 2013, Victim told Foster Mother and Foster Father that Victim was living with them because, while pointing to her vaginal area "her daddy down there (indicating) with his pee-pee." A few days later, Victim repeated this disclosure to Foster Mother and added "in her butt." Victim stated that Hook had told her not to tell but that she told Grandmother and Foster Mother.

Forensic interviewer at the Child Advocacy Center Ashton Eibel ("Eibel") interviewed Victim on two occasions and both were recorded by video. Videos of both interviews were played for the jury. Eibel testified that she was trained not to lead children to answer in a particular way by asking open-ended questions and inviting narrative responses so children can tell what happened in their own language. In the video of the first interview on July 15, 2013, Victim stated that her mother was in jail and she wants her back because "[Hook] is so crazy that he does this (pointing to her genital area) in there my pee-pee . . . it's crazy." Victim stated her "pee-pee" has an "owie." Victim stated her "pee-pee" hurts because it has a "boo-boo" from jumping and falling on her "pee-pee" and "it went blood red." Victim stated that Hook put "his pee-pee . . . in [her] pee-pee" and her butt when she had an "owie" and was bleeding and she said, "no, no, no." She stated that he put his "pee-pee" in her "pee-pee" more than one time. Victim stated this happened at home while her mother was in jail. She stated she was on the couch where she was watching movies with people putting "pee-pee in your mouth" and "putting pee-pee in adult pee-pee." She stated that when Hook put his "pee-pee" in her "pee-pee" it felt bad and hurt. She stated that she told Grandmother what Hook did, she stated, "I told on daddy" and Grandmother was upset. She stated that Hook put his "pee-pee" in her butt one time at home when she was five.

Eibel interviewed Victim again on February 24, 2014, after being notified either by Children's Division or law enforcement that Victim had made an additional disclosure. Eibel stated that additional disclosures are common with child sexual assault victims. In that interview, Victim made the additional allegation that Hook made her "suck his pee-pee." In the video Victim came in and without prompting drew a picture of Hook and herself and said "he did both of the things," "he did two times," his "pee-pee" in her "pee-pee and butt." She explained that the picture is of herself walking away from Hook and telling him to leave her alone but that he didn't leave her alone; that he "did it" two times which she clarified to mean "put his pee-pee in my pee-pee and butt" and "he's in jail for that." She stated that she is telling the truth. She stated that she asked Hook to watch cartoons with her

but he put on an adult show which was not good. She stated it was about a girl who put the boy's "pee-pee" in her mouth and sucked it. Victim stated that Hook did that to her; that he asked her to and she said she didn't want to; and that he made her do it to him. She stated that he made her "suck his pee" and she thought pee was going in her mouth. She thinks she got sick from that—a hard cough. She said it was horrible and nasty. She said afterwards they put their clothes on and came out of the bedroom to get a drink. And then Hook got some things "that go in the pee" that looked like soap which he put on her "pee-pee" and his "pee-pee." Victim stated that they stopped because someone knocked on the door so they put on their clothes. She says she told her mother. She repeated that Hook put his "pee-pee" in her "pee-pee" and butt.

Based on statements Victim gave during the July 15, 2013 forensic interview, Detective Tracey Whearty ("Det. Whearty") applied for a search warrant looking for pornographic material and bodily fluids around the couch and in the living room of Hook's residence. The search warrant was executed on July 26, 2013. A videotape was found in the VCR in the living room which was hooked to the TV. When played, the videotape depicted "footage of a female performing oral sex on a male. And then the footage showed close up, zoomed in on the female performing oral sex on the male. And then it showed the male inserting his penis in the female's vagina." Two sections of the couch cushion that appeared to have stains were cut and secured in evidence and sent to a lab for DNA testing to compare with DNA samples previously taken from Victim and Hook.

Stacey Bolinger ("Bolinger"), the supervisor of the DNA case work section of the Missouri State Highway Patrol crime laboratory testified that the DNA test performed on a stain from Hook's couch was done by criminalist Melina Jimenez ("Jimenez"), an employee that Bolinger supervised. Jimenez is no longer employed by the Missouri State Highway Patrol. Bolinger testified that results of the DNA testing of the stain were consistent with Hook's DNA profile. The DNA lab report was admitted as State's exhibit 43. Bolinger stated that the stain had a non-sperm fraction and a sperm fraction. Bolinger testified that the DNA profile of non-sperm fraction is consistent with being a mixture of two people and displayed female gender attributes but both Victim and Hook were eliminated as a source of the major contributing profile of that fraction. The source of the major contributor of the non-sperm fraction was undetermined.

Staci Walters ("Walters") testified that she performed a SAFE (Sexual Assault Forensic Exam) exam of Victim on July 15, 2013, in the emergency room. Walters testified that when she asked Victim why she was there Victim replied, "that she had a hurt pee-pee, and she had a red owie ... she pointed to her rectum with her finger and said, this is where I hurt." She stated during her attempt at a vaginal exam Victim said that it hurt and it was tender to the touch so Walters was not able to view the hymen as well as she wanted. With regard to Victim's rectal area, Walters found Victim to have poor rectal tone, redness in the anal folds, and an area that was linear whitish silver which might have indicated previous scarring. Walters testified that these injuries could have come from injury, hygiene or sexual abuse. Walters stated that in child sexual assault cases it is common not to have injuries. She testified that her findings were inconclusive for abuse.

> Dr. Holly Monroe ("Dr. Monroe") performed a SAFE exam on Victim on September 12, 2013, a recheck requested two months prior by Walters. This exam rendered normal results. Dr. Monroe testified that the injuries noted by Walters were not consistent with falling down.

Resp't Ex. I, at 2-6. Petitioner was charged with first-degree child molestation, first-degree statutory sodomy, first-degree statutory rape, and incest. *Id.* at 6. On June 12, 2015, Petitioner was found guilty after a jury trial of all four charges. *Id.* On August 20, 2015, he was sentenced to ten years' imprisonment on each of the convictions of molestation, statutory sodomy, and statutory rape, and four years' imprisonment on the conviction of incest, with all sentences to be served consecutively. *Id.* On November 8, 2016, his convictions were affirmed on direct appeal. Resp't Ex. E.

On February 6, 2017, Petitioner filed his pro se motion to vacate, set aside or correct the judgment or sentence pursuant to Mo. Sup. Ct. R. 29.15. ECF No. 31-1. On June 19, 2017, through appointed counsel, Petitioner filed his Amended Rule 29.15 Motion to Vacate Judgment and Sentence, asserting several claims of ineffective assistance of trial counsel and appellate counsel. ECF No. 31-2. The motion court held a hearing on Petitioner's claims. Resp't Ex. B. On February 21, 2019, the motion court sustained five claims of ineffective assistance of trial counsel, vacated Petitioner's convictions, and ordered a new trial. Resp't Ex. I, at 6; ECF No. 31-3. The state appealed. The Missouri Court of Appeals considered all five claims on the merits and reversed the decision of the motion court on all five claims. Resp't Ex. I, at 7-35.

On October 19, 2021, Petitioner's pro se petition was electronically filed in the instant action. ECF No. 1. On February 4, 2022, through counsel, Petitioner filed an amended petition. ECF No. 9. In the amended petition, Petitioner asserts two grounds for relief: (1) ineffective assistance of trial counsel based on the failure to investigate and present expert testimony regarding the interview techniques utilized in the child advocacy center interviews of the alleged victim, the

4

investigation into the allegations of abuse, and the factors impacting disclosures of abuse; and (2) ineffective assistance of trial counsel based on the failure to obtain and present certified copies of the alleged victim's medical records from Boone Convenient Care ("BCC") of the first sexual assault examination performed on the alleged victim.

## II.  LEGAL STANDARD

Where a claim has been adjudicated on the merits in state court proceedings, a federal court may grant habeas relief only if the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[A] determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has the "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1).

A state court decision is "contrary to" clearly established Supreme Court precedents "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision involves an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407-08; *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court decision is based on an unreasonable determination of

the facts only if the court's presumptively correct factual findings do not enjoy support in the record." *Bahtuoh v. Smith*, 855 F.3d 868, 873 (8th Cir. 2017) (internal quotation marks omitted).

## III.  DISCUSSION

### A. Timeliness

The Court first considers Respondent's contention that the petition in this case was not timely filed. As relevant here, 28 U.S.C. § 2244(d)(1) provides for a "1-year period of limitation" applicable to state habeas petitions that runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."[1] Additionally, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). The parties appear to agree that Petitioner's judgment became final, and the limitations period started to run, on November 23, 2016; that the period ran for the 75 days before he filed his post-conviction motion on February 6, 2017; that the period was then tolled until post-conviction relief review ended on December 30, 2020; and that at that point 290 days remained. The limitations period thus ended on Saturday, October 16, 2021, meaning that the petition needed to be filed no later than Monday, October 18, 2021, to be timely. *See* Fed. R. Civ. P. 6(a)(1)(C). Respondent argues that because the petition was not electronically filed in this Court until October 19, 2021, it was untimely.[2]

---

[1] The statute includes several other dates from which the period may start to run, none of which are relevant here.

[2] Respondent does not argue that the amended petition filed on February 4, 2022, does not relate back to the originally filed petition. *See* Response to Order to Show Cause, ECF No. 15, at 12. ("[Petitioner] subsequently filed an amended petition on February 4, 2022. Doc. 9. The timeliness calculation remains the same because the amended petition appears to raise claims that 'relate back' to the original petition").

The Court finds the petition was timely filed. "[F]or purposes of applying 28 U.S.C. § 2244(d), a pro se prisoner's petition for a writ of habeas corpus is filed on the date it is delivered to prison authorities for mailing to the clerk of the court." *Nichols v. Bowersox*, 172 F.3d 1068, 1077 (8th Cir. 1999), *abrogated on other grounds by Riddle v. Kemma*, 523 F.3d 850 (8th Cir. 2008). In his petition, Petitioner declares under penalty of perjury that the petition was placed in the prison mailing system on October 1, 2021. Pet'n, ECF No. 1, at 15. Additionally, Petitioner has submitted a receipt showing that it was mailed on October 15, 2021. *See* Pet'r Ex. 3, ECF No. 25-1. Based on this evidence, the Court finds that the petition was filed on October 1, 2021, the day it was placed in the prison mail system. Even if it was placed in the prison mail system on some later date, it must have been placed there by October 15, 2021, the date it was mailed. Because the Court finds the petition was timely filed, the petition will not be dismissed as untimely.

**B.  Petitioner's Ineffective Assistance of Counsel Claims**

Both of Petitioner's claims are based on his assertion that his trial counsel was ineffective. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). To show ineffective assistance of counsel, a petitioner must show both that "[his] counsel's performance was deficient" and that "the deficient performance prejudiced [his] defense." *Id.* at 687. To show deficient performance, Petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential," and Petitioner bears a heavy burden in overcoming "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689 (citation and internal quotation marks omitted). To show prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter,* 562 U.S. 86, 111 (2011). "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. *Id.*

"Although *Strickland* requires a showing of both deficient performance and prejudice, a court deciding an ineffective assistance claim need not address both components of the inquiry if the defendant makes an insufficient showing on one. If it is easier to dispose of an ineffectiveness claim on grounds of lack of sufficient prejudice, . . . that course should be followed." *See Whitehead v. Dormire*, 340 F.3d 532, 537 (8th Cir. 2003) (internal quotation marks omitted). Here, for both of Petitioner's claims, the Missouri Court of Appeals rested its decision solely on Petitioner's failure to establish the prejudice prong of *Strickland*. Because the Court finds Petitioner cannot establish the prejudice prong for either claim, the Court need not address the deficient performance prong.

### 1. Ground One: Failure to Investigate and Present and Regarding Interview Techniques Used in Child Advocacy Center Interviews and Investigation

In Ground One, Petitioner asserts ineffective assistance of trial counsel based on the failure of trial counsel to investigate and present expert testimony regarding the interview techniques utilized in the child advocacy center interviews of the alleged victim (by Ashton Eibel), the investigation into the allegations of abuse, and the factors impacting disclosures of abuse. Petitioner argues that trial counsel was ineffective for failing to call Dr. Rosalyn Schultz, or a similar expert, to testify that the interviews of Victim did not reflect best practice guidelines and protocols for the investigation of child sexual abuse cases and to provide information about the

quality of the investigation into Victim's allegations of abuse. Petitioner argues that he was prejudiced by the failure to present this evidence because Dr. Schultz's testimony would have created a reasonable doubt in the minds of the jurors and because without such testimony, there was no evidence presented to contradict the prosecution's key evidence.

The motion court sustained this claim, and the Missouri Court of Appeals reversed. Resp't Ex. I, at 19-27. The Missouri Court of Appeals summarized the hearing testimony relevant to this claim as follows:

> At the PCR hearing, Dr. Schultz and trial counsel both testified. Dr. Schultz testified about her extensive training in forensic interviews of child victims of sexual abuse. She testified that she had been contacted by Hook's two prior attorneys. In February 2014, the first attorney contacted and engaged her for evaluation of the criminal investigation, and regarding the quality of Eibel's interviews with Victim and whether best practices were used. In May 2014, the second attorney sought her available dates to testify at both the 491 hearing and the trial. Trial counsel did not contact Dr. Schultz at all.
>
> Had she been contacted, she would have been able to offer an opinion as to the quality of the investigation and an opinion regarding whether best practice guidelines were followed. Dr. Schultz testified that the best practice guidelines are nationally developed by several organizations for forensic and investigative interviews of child victims. These guidelines provide a framework for professional interviewers, are well respected, and used throughout the United States. After reviewing the records and interviews in Hook's case, Dr. Schultz found significant difficulties with the investigation and the forensic interviews of the Victim. She stated such guidelines were not adequately followed, specifically: the timing and circumstances were not flushed out; a family history of what was occurring at that time of the alleged incident was not obtained; a medical history of the Victim was not obtained; the interviewer did not follow up on the "owie" described by Victim and potential causes of same (see, supra); and, Dr. Eden was not interviewed. With regard to Eibel's interviews with Victim, Dr. Schultz stated the best practices guidelines were not followed. Dr. Schultz identified several specific ways in which Eibel's interviews failed to follow best practices, including her failure to follow up on a bike accident as a potential source of Victim's vaginal or anal injuries.
>
> Trial counsel testified that when he represented Hook at trial he was in private practice but represented Hook on a contract basis with the public defender's office. Trial counsel testified that he had been an attorney for 22 years. He stated that he had been in private practice for 12 years and previously worked for the public defender's office where he held the position of district defender twice. Trial counsel testified that he had handled 50 to 100 child sex cases and tried approximately a dozen. He stated that he began representing Hook in October 2014,

and acknowledged that he would have received and reviewed the public defender's file. He stated that he knew from the file that Dr. Schultz had been hired by Hook's previous counsel. He stated that he was aware of the purpose for her but that he "rejected that outright as a witness" without contacting her or knowing what testimony she might offer. He stated that he did not know about the best practices guidelines. He stated that he "made an assumption about the general stuff that she would probably be testifying to, and I rejected that as I wasn't going to use that witness or that strategy." When asked how often he had used a witness like Dr. Schultz, trial counsel replied, "Never. I mean I've used experts but not in a child sex case … to challenge whether or not the interviewing techniques were leading or stuff like that. I've never used an expert for that purpose." When asked if he recalled that he challenged Eibel at trial about her interview with Victim, trial counsel testified, "[I]f there were places I thought she was leading, I would probably challenge her on it. I usually think if an interviewer is leading a kid that it's pretty obvious to most adults that's what's going on."

Resp't Ex. I, at 20-22 (footnote omitted).

Analyzing the merits of the claim, the Missouri Court of Appeals cited *Strickland* and discussed its two-prong test. *Id.* at 7-8, 23-24. The court stated that it did not need to determine the correctness of the motion court's finding on the deficient performance prong of *Strickland* because "[e]ven assuming that counsel's decision not to call Dr. Schultz to testify constituted deficient performance, the motion court clearly erred in concluding that presenting Dr. Schultz's testimony would have created a reasonable probability of a different outcome." *Id.* at 24. The court offered several reasons for its conclusion.

First, the court found that to the extent Dr. Schultz was criticizing the investigative techniques used by law enforcement or others, those critiques did not "fall[] within the allegations of ineffective assistance of counsel contained in [Petitioners] amended motion," which alleged that trial counsel was deficient for failing to "call an expert on children's advocacy center interviews and interviewing techniques for sexually abused children." *Id.* at 24. It stated, "[t]he amended motion does not allege that counsel was deficient for failing to call an expert to evaluate the

investigative techniques used by others, and any such claim is accordingly waived." *Id.* (citing *Shockley v. Missouri*, 579 S.W.3d 881, 899 (Mo. 2019)).

Second, the court found that although Dr. Schultz's testimony evaluated the techniques employed during the two forensic interviews conducted by Eibel, she "did not offer any testimony to suggest that the circumstances surrounding the Victim's *other* disclosures rendered those statements unreliable." *Id.* at 24. The court noted that "[e]vidence was presented at trial concerning consistent disclosures Victim made to Grandmother, Hook, Dr. Eden at BCC, Foster Mother, and Foster Father, all *before* her interview with Eibel." *Id.* It found that "[n]othing in Dr. Schultz's testimony would have impacted the jury's consideration of these multiple, and consistent, disclosures." *Id. See also* Resp't Ex. A at 216-18; 220-21; 224–226); Resp't Ex. B at 75-175.

Third, the court found that the probative value of Dr. Schultz's testimony was limited by the qualified nature of her opinions and her lack of direct experience conducting the type of forensic interviews she was being asked to evaluate. Resp't Ex. I, at 25. It noted that she acknowledged on cross-examination that she was not testifying that Victim's disclosures were "contaminated" or rendered unreliable, but rather that the deficiencies she noted "could contribute to problems that could contaminate the outcome of the case." *Id. See also* Resp't Ex. B at 154-56. The court also noted that although Dr. Schultz was a qualified expert witness, it was significant that she acknowledged that she had never worked in a child advocacy center and had never conducted the type of forensic interviews she was being asked to evaluate in this case. Resp't Ex. I at 25. *See also* Resp't Ex. B at 111-13, 156.

Fourth, the court found it significant that, "apart from generalized testimony concerning best-practice guidelines for forensic interviews, Dr. Schultz offered only a limited number of specific critiques of the interviews conducted by Eibel," and it found that several of her criticisms

were highlighted by trial counsel in cross-examination and in closing argument. Resp't Ex. I, at 25-26. It found that the "most prominent specific criticism Dr. Schultz offered" was that Eibel failed to follow up when Victim referred to an accident in which she had injured her vaginal area or anus, which could have presented an alternative explanation for any physical symptoms she was experiencing, instead redirecting Victim back to talk about Petitioner's actions. *Id.* at 25. The court noted that trial counsel specifically highlighted this issue both in cross-examining Eibel and in closing argument *Id. See also* Resp't Ex. A, at 146-47, 245-46.  It further noted that, as to Dr. Schultz's criticism that when Victim stated that Petitioner had placed his "pee pee" in her "pee pee," Eibel inappropriately reminded Victim that she had previously stated that he put his penis in her "butt," trial counsel specifically raised the same issue in cross-examining Eibel. Resp't Ex. I, at 25-26. *See also* Resp't Ex. A, at 149. Finally, the court noted that trial counsel cross-examined Eibel about, and/or highlighted in closing argument, several other concerning aspects of Victim's forensic interviews: that the Victim said her birthday was "right now" when it was weeks away; that Victim said she would be entering "fourth grade," which was plainly inaccurate; that Victim said at the outset of her second forensic interview that she and Eibel had spoken "yesterday" when it was in fact months earlier; that Victim seemed unusually eager in her second interview to talk about Petitioner's abuse and stated, "I'm supposed to tell" about specific actions by Petitioner; and that Eibel failed to ask Victim about an incident in the shower, even though that was the initial disclosure that triggered Grandmother's concerns. Resp't Ex. I, at 26. *See also* Resp't Ex. A, at 141-44, 150, 241, 244, 246.

Fifth, the Missouri Court of Appeals  found that Dr. Schultz's "credibility would have been seriously diminished by her inaccurate reliance on a supposed instance of bias by Eibel, which did not in fact occur." Resp't Ex. I, at 26. The court cited testimony from Dr. Schultz indicating that

Eibel's neutrality would be called into question by Eibel's statement that one of the goals of forensic interviews is "to collect information for the team members that's hopefully corroborative of the alleged allegation or information." *Id.* It found that Eibel had not made such a statement, but instead had testified that "[t]he goal of a forensic interview is to obtain as much information as possible, to better clarify the allegations in a child abuse case." Resp't Ex. I, at 26.

Sixth, the Missouri Court of Appeals found that as to the other critiques Dr. Schultz offered, Dr. Schultz did not explain how they affected the reliability of the interviews or how the problems, in context, would have influenced Victim in this case. Resp't Ex. I, at 27.

The Missouri Court of Appeals concluded that "even if counsel had called Dr. Schultz to testify and impeach Eibel's techniques, [Petitioner] failed to demonstrate a reasonable probability that the outcome of trial would have been different." *Id.*

As discussed above, a federal court may grant habeas relief on this claim only if the state court's adjudication of the claim resulted in a decision that was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). It is not entirely clear which of these bases Petitioner is relying on.[3] The Court will consider each.

---

[3] In the amended petition, filed through counsel, Petitioner does not discuss any of the three bases on which a court may grant habeas relief under 28 U.S.C. § 2254(d). In the traverse, also filed through counsel, Petitioner discusses at length the general standards that courts apply in assessing all three bases for relief, but he does not expressly state which bases he relies on here, nor does he expressly apply any of the standards to the facts here. He sets forth various asserted failings of the Missouri Court of Appeals and concludes, "The findings of the Missouri Court of Appeals rested upon an unreasonable application of fact and law under § 2254(d)(1) and (2)." Traverse, ECF No. 25, at 18.

> i.  Whether the decision on Ground One was "based on an unreasonable determination of the facts"

The Court first considers whether the state court's adjudication of Ground One "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d)(2). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Although "the term 'unreasonable' is no doubt difficult to define, . . . a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (internal citation and quotation marks omitted). "A state court decision is based on an unreasonable determination of the facts only if the "court's presumptively correct factual findings do not enjoy support in the record." *Bahtuoh v. Smith*, 855 F.3d 868, 873 (8th Cir. 2017) (internal quotation marks omitted). "AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro*, 550 U.S. at 473 (quoting § 2254(e)(1))

Petitioner makes three challenges to the factual findings on which the Missouri Court of Appeals based its prejudice determination.[4] First, Petitioner challenges the Missouri Court of Appeals' finding that although Dr. Schultz's testimony evaluated the forensic interviews conducted by Eibel, "Dr. Schultz did not offer any testimony to suggest that the circumstances

---

[4] Petitioner does not challenge the other factual determinations made by the Missouri Court of Appeals as to this claim. Those factual determinations appear to be reasonably supported by the record.

surrounding the Victim's *other* disclosures [those made to Grandmother, Petitioner, Dr. Eden, Foster Mother, and Foster Father *before* the interviews with Eibel] rendered those statements unreliable." Resp't Ex. I, at 24. For this challenge, Petitioner points to (1) Dr. Schultz's testimony noting that Grandmother was "appalled" and "very upset" by the initial disclosure of abuse and that Grandmother should have been interviewed about the "timing and circumstances" of the initial disclosure, Resp't Ex. B, at 117-19, 132; and (2) Dr. Schultz's testimony noting that Victim's parents were participating in marital counseling in early 2013 and that areas not explored included the types of conflicts going on at the time, what was going on with the family and parents, and Victim's relationship with her parents, *id.* at 120. After review of the cited testimony and the record as a whole, the Court finds the Missouri Court of Appeals' determination reasonable. Although the cited testimony suggests that Dr. Schultz believed the circumstances surrounding Victim's early disclosures should have been further explored, Dr. Schultz did not explain how the absence of exploration of Grandmother's moods, Victim's parents' marital counseling, or the family's relationships and conflicts undermined the reliability of the Victim's multiple and consistent disclosures of abuse to Grandmother and other individuals. It was not unreasonable for the state court to determine, based on the evidence presented in the state court proceedings, that Dr. Schultz's testimony would not have undermined those disclosures.

Second, Petitioner appears to challenge the Missouri Court of Appeals' determination that Dr. Schultz had never worked in a child advocacy center and had never conducted the type of forensic interviews she was asked to evaluate in this case. This challenge is without merit. As Petitioner points out, Dr. Schultz testified to extensive experience and education in the area of investigation of child sexual abuse cases, including experience conducting clinical and forensic interviews with children and adolescents in child sexual abuse cases. Resp't Ex. B, at 77-90, 169-

70.  However, consistent with the state court's finding, Dr. Schultz clearly testified that she has never done a forensic interview of a child victim in a criminal sex abuse case and had never worked for a child advocacy center. *Id.* at 111-12.

Third, Petitioner challenges the Missouri Court of Appeals' determination that Dr. Schultz's "credibility would have been seriously diminished by her inaccurate reliance on a supposed instance of bias by Eibel, which did not in fact occur." Resp't Ex. I, at 26. In making this determination, the Missouri Court of Appeals stated:

> In her testimony at the PCR Hearing, Dr. Schultz stated that, in describing the goals of a forensic interview, Eibel had stated "that one of the goals was to . . . corroborate the allegation," which Dr. Schultz considered to be inconsistent with the neutrality of a forensic interviewer. Hook's post-conviction counsel then purported to quote from page 131 of the trial transcript, where Eibel supposedly testified that one of the goals of the interview was "to collect information for the team members that's hopefully corroborative of the alleged allegation or information." *Id.* Dr. Schultz agreed that this testimony was evidence of bias. The problem is, however, that this is not what Eibel actually said. Instead, on page 131 of the trial transcript. Eibel testified:
>
>> A forensic interview is a structured conversation with a child, intended to elicit detailed information about an event the child may have witnessed or experienced. *The goal of a forensic interview is to obtain as much information as possible,* **to better clarify the allegations in a child abuse case.**

*Id*. at 26 (emphasis in Missouri Court of Appeals' decision).

The Court agrees with Petitioner that the state court record refutes the Missouri Court of Appeals' factual determination on this point, at least in part. The following exchange occurred at the evidentiary hearing between Petitioner's counsel and Dr. Schultz:

> Q.    If the transcript reflects on page 131 that in response to what the goals were of a CAC interview, her response was "To collect information for the team members that's hopefully corroborative of the alleged allegation or information." Would that be something that you would consider being neutral in regard to the interview?
>
> A.    No, I would not.

16

Resp't Ex. B, at 144-45. The Missouri Court of Appeals, having been directed to "page 131" of "the transcript" by Petitioner's counsel at the evidentiary hearing, reasonably consulted the only transcript that apparently contained a page 131 at the time of the questioning—the trial transcript. It then correctly found that "page 131" did not contain the quoted testimony, and instead contained different testimony from Eibel about the goal of a forensic interview. Resp't Ex. A, at 131. However, as Petitioner now points out, the state court record *does* contain the quoted testimony from Eibel, just in a different place. On October 15, 2013, Eibel testified at a hearing in a collateral juvenile proceeding in the Circuit Court of Randolph County, Missouri, Case No. 13RA-JU00053. Pet'r Ex. 4, ECF No. 25-2. The transcript containing this testimony, which is 48 pages long, was admitted into evidence as Exhibit 18 during the evidentiary hearing before the motion court. *See* Resp't Ex. B, at 20. At page 13 of that transcript, Eibel testified as follows:

> Q.    What is the advantage of having the child undergo a forensic interview, versus being questioned by those other professionals?
>
> A.    The Rainbow House Advocacy Center is a child friendly, neutral setting to talk with children. And also, I'm an unbiased person conducting the interview. But **the goal is to collect information for the team members that's hopefully corroborative information**.

Pet'r Ex. 4, at 13 (emphasis added). Based this evidence, to the extent that the Missouri Court of Appeals found that Eibel never testified that the goal of a forensic interview is "to collect information for the team members that's hopefully corroborative of the alleged allegation or information," such that Dr. Schultz's credibility would have been undermined by Dr. Schultz's belief that such testimony existed, Petitioner has presented clear and convincing evidence to the contrary.

Even where a specific factual finding has been shown to be incorrect, "it does not necessarily follow that the state court adjudication was based on an unreasonable determination of

17

facts because subsection (d)(2) instructs federal courts to evaluate the reasonableness of the state court decision 'in light of the evidence presented in the State court proceeding.'" *Collier v. Norris*, 485 F.3d 415, 423 (8th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(2)). *Accord Donelson v. Steele*, 16 F.4th 559, 569 (8th Cir. 2021). "[I]t is not sufficient to show the state court's decision merely *included* an unreasonable factual determination. Instead, by its terms § 2254(d)(2) only empowers federal courts to grant relief if the state court's decision was *based on* an unreasonable determination of the facts." *Id.* (quoting *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018)). *See also Lambert v. Blackwell,* 387 F.3d 210, 235-36 (3d Cir. 2004) ("[E]ven if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision  must still be weighed under the overarching standard of section 2254(d)(2)").

In determining whether a state court decision that includes an erroneous factual determination was "based on" an unreasonable determination of the facts, the Court may consider factors including how significant the erroneous factual determination was to the decision, whether the decision was supported by other facts in the record, whether the facts that support the determination are independent of the erroneous factual determination, and whether the state court's reasoning and conclusion would have been the same absent the factual error. *See Donelson*, 16 F.4th at 569-70 (finding state court decision was "based on" an unreasonable determination of the facts where one of the three factual bases for the decision was unreasonable; reasoning that "the 'three factual bases' for the [state] court's decision were not separate and independent from one another," that one of the technically accurate facts appeared to be "completely dependent on" the unreasonable determination of fact, and that it was "hard to imagine that the state court's reasoning and conclusion would have been the same" had it not made the unreasonable factual determination); *Collier*, 485 F.3d at 422-24 (holding that despite two erroneous factual

determinations by the state court (referring to multiple witnesses having seen a shooting where only one witness had seen the shooting and attributing one witness's testimony to a witness who did not testify), the petitioner did not show that the state court decision was based on an unreasonable determination of the facts because the other evidence in the state court record supported the state court's conclusion); *Kachina v. Minnesota*, No. CIV 06-3661 ADM/JJG, 2008 WL 2510156, at *15–16 (D. Minn. June 19, 2008) (finding state court's erroneous statement that that a witness had identified the defendant at trial "was not a significant basis for its conclusion that [the witness's] show-up identification was reliable"; noting that the state court had emphasized the "totality of the circumstances" and "additional facts supporting" the conclusion); *Cox v. Norris*, No. 5:02CV00234JWC, 2005 WL 1922634, at *12 (E.D. Ark. July 19, 2005) (holding that a state court decision was not based on an unreasonable determination of the facts where state court's error did not "not materially undermine the [state court's] determination that the evidence was sufficient to support Petitioner's involvement in the crime"), *aff'd*, 177 F. App'x 516 (8th Cir. 2006). *See also Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023) ("The state court's decision is not 'based on' a finding if (1) it made the finding in addressing only subsidiary issues, or (2) other reasons supported the court's decision.") (internal citation and quotation marks omitted); *O'Quinn v. Spiller*, 806 F.3d 974, 978 (7th Cir. 2015) (state court decision was not "based on" unreasonable determination of the facts where it could not "reasonably be argued that th[e] modest factual mistake had any meaningful effect on the state court's decision").

Here, the Court finds that despite the above-described erroneous factual determination, the Missouri Court of Appeals' determination that Petitioner suffered no prejudice from the failure to consult or call Dr. Schultz was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." As discussed at length above, the state

court offered numerous factual bases for its determination of no prejudice, all of which were completely independent of the erroneous factual determination at issue. These included the state court's reasonable finding that Dr. Schultz's testimony did not undermine the reliability of the consistent disclosures that Victim made to several other people *before* the possibly problematic interviews with Ms. Eibel, the state court's reasonable finding that several other facts would have limited the probative value of Dr. Schultz testimony (including the qualified nature of her testimony, the fact that she had never conducted forensic interviews of child sexual abuse victims, and the fact that she had never worked in a child advocacy center), and the state court's reasonable finding that many of the key criticisms of Eibel's interviews raised by Dr. Schultz were raised by Petitioner's counsel during cross examination and/or closing argument. The Court finds that the erroneous factual determination was of minimal importance to the determination and that the state court's determination would have been the same  absent the erroneous factual finding.

> ii.    *Whether the decision on Ground One was "contrary" to clearly established federal law*

As set forth above, a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams*, 529 U.S. at  405-06. Petitioner does not  appear to argue that the Missouri Court of Appeals' decision on Ground One was "contrary to" clearly established federal law, as established by the Supreme Court of the United States, nor does the Court find that it was. Here, the Missouri Court of Appeals properly identified and articulated the rule set forth in *Strickland* and applied it to Petitioner's claim, and Petitioner does not argue that it applied any rule contradicting *Strickland* or any other governing law set forth by the Supreme Court. Petitioner

does not direct the Court to any decision of the Supreme Court that confronted materially indistinguishable facts but arrived at a different result. Thus, Petitioner is not entitled to relief on this basis.

### iii. Whether the decision on Ground One involved an "unreasonable application" of clearly established federal law

A state court decision involves an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407-08; *see also Bell*, 535 U.S. at 694. To meet the "unreasonable application" standard, "a prisoner must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (per curiam)). "The prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). *See also Lockyer v. Andrade,* 538 U.S. 63, 75 (2003) ("Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable.") (internal citation and quotation marks omitted).

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Richter*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to

reasonably determine that a defendant has not satisfied that standard." *Shinn*, 592 U.S. at 119 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

As discussed above, "in assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter,* 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. *Id.* In assessing prejudice from failure to call a witness, relevant factors include "the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses"; "the interplay of the uncalled witnesses with the actual defense witnesses called"; and "the strength of the evidence actually presented by the prosecution." *Woods v. Norman*, 825 F.3d 390, 395-96 (8th Cir. 2016) (internal quotation marks omitted).

Petitioner argues that there is reasonable probability that the outcome of Petitioner's trial would have been different had Dr. Schultz testified. Petitioner emphasizes Dr. Schultz's extensive experience and education and the fact that the motion court (which was in the best position to evaluate her credibility) found her testimony "impressive." *See* ECF No. 31-3, at 16. Petitioner also notes that Petitioner's trial counsel called no other witnesses in his defense, and that trial counsel's defense strategy was to undermine the credibility of the State's witnesses—a strategy that would have been bolstered by Dr. Schultz. Petitioner also argues that Dr. Schultz's testimony was critical because the prosecution's case "rested solely upon" Victim's allegations and because trial counsel could not replicate the effect of Dr. Schultz's expert testimony merely by cross-examining Eibel. *See* Amd. Pet., ECF No. 9, at 35-36.

The Court acknowledges that the evidence cited by Petitioner could have supported a finding of *Strickland* prejudice. However, "even a strong case for relief does not mean the state

court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 101. Applying the deferential standards the Court must apply for purposes of habeas review, the Court does not find the Missouri Court of Appeals' application of *Strickland* was unreasonable. The state court's decision was supported by several good reasons that have support in the record. The court reasonably considered that the value of Dr. Schultz's testimony was limited by the qualified nature of her opinions, the fact that she had never worked in a child advocacy center, and the fact that she had never conducted the type of forensic interviews she was asked to evaluate. The court also reasonably considered that even if Dr. Schultz's testimony might have impacted the jury's consideration of Victim's interviews with Eibel, it would not have impacted the jury's consideration of a significant body of strong evidence against Petitioner—Victim's consistent disclosures of abuse to several other individuals *before* her interviews with Eibel. The court also reasonably considered that any prejudice from failing to call Dr. Schultz was mitigated by the fact that most of the significant issues Dr. Schultz would have raised with regard to Eibel's interview techniques *were* highlighted by trial counsel during cross-examination and/or closing argument. In light of these considerations, the Missouri Court of Appeals' decision—that there was no reasonable probability that the outcome of Petitioner's trial would have been different had Dr. Schultz testified, and thus no *Strickland* prejudice—was not "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement." *See Shinn*, 592 U.S. at 118 (quotation marks omitted). *See also Taylor v. Kelley*, 825 F.3d 466, 470 (8th Cir. 2016) (habeas relief is not warranted "if fairminded jurists could agree with the state court's decision regarding prejudice") .

For all of the above reasons, Petitioner has not shown that the Missouri Court of Appeals' finding that he was not prejudiced under *Strickland* by his counsel's failure to consult or call Dr. Schultz was contrary to clearly established federal law, was an unreasonable determination of

clearly established federal law, or was based on an unreasonable determination of the facts. Because Petitioner cannot establish the prejudice prong of *Strickland*, he cannot prevail on his ineffective assistance of counsel claim, and the Court need not address the deficient performance prong of *Strickland*. Ground One will be denied.

### 2.  Ground Two: Failure to Obtain and Present Certified Copies of Victim's Medical Records from BCC

In Ground Two, Petitioner argues that his trial counsel failed to obtain and present certified copies of Victim's July 12, 2013, medical records from BCC of the first sexual assault examination performed on the alleged victim, performed by Dr. Andrea Eden. This examination showed normal physical findings. Petitioner argues that if counsel had obtained these records, counsel could have impeached the testimony of Ms. Walters, who conducted a SAFE examination three days later that contained abnormal physical findings, and the testimony of Dr. Holly Monroe, who performed a third physical examination two months later and who testified that her examination was normal but that the best time to find injuries is as soon as possible after the assault, because children heal quickly in that area of the body.

The motion court sustained this claim, and the Missouri Court of Appeals reversed. Resp't Ex. I, at 27-31. The Missouri Court of Appeals summarized the evidence relevant to this claim as follows:

> At the PCR hearing, trial counsel testified that he was aware of the BCC records before trial but not its significance, stating, "I just missed it." He admitted the records were part of the file when it was given to him. Trial counsel stated that he did not request a business records certification but that he should have done so. Trial counsel testified that upon realizing mid-trial that he had the BCC records in his file, he wanted to get them into evidence, and attempted to do so by trying to cross-examine Dr. Monroe with the records but the State's objection to his efforts was sustained.
>
> The BCC records reflect, in pertinent part, that on July 12, 2013, Grandmother brought Victim in for alleged sexual abuse. It lists as chief complaint/reason for visit:

> Maternal grandma present who states that pt told her today that her dad was touching her private parts. The incident occurred on 7/10. Pt states she was taking a shower with her dad and he touched her vaginally. Pt then stated without prompting from the grandma that her dad took her to the living room and put his "pee pee area" in her butt and her "pee-pee area." This caused her discomfort at the time but she denies pain currently.

The BCC records indicated no physical injuries were found.

Resp't Ex. I, at 28. The Missouri Court of Appeals also discussed the motion court's findings that the BCC examination occurred on the same day Victim disclosed the abuse to Grandmother, that Dr. Eden at BCC found the vaginal and rectal areas to be normal, and that Ms. Walters' examination revealing abnormal findings was done at least three days after Petitioner no longer had access to Victim. *Id.* at 28-29.

In reversing the decision of the motion court, the Missouri Court of Appeals stated, "even if counsel's performance was deficient in this regard, the motion court clearly erred in finding that Hook had established *Strickland* prejudice." Resp't Ex. I, at 30. The Missouri Court of Appeals offered several bases for its conclusion that Petitioner was not prejudiced by his counsel's failure to obtain and present the BCC records.

First, the Missouri Court of Appeals found that the BCC records themselves contained documentation unfavorable to Petitioner: (1) a note indicating that Victim "states she was taking a shower with her dad and he touched her vaginally", and (2) a note indicating that Victim "then stated without prompting from the grandma that her dad took her to the living room and put his 'pee pee area' in her butt and her 'pee pee area.'" Resp't Ex. I, at 30. The court stated that "the report documents an incident of inappropriate touching in the shower (an incident not documented in Victim's forensic interview), as well as Victim's *unprompted* disclosures of anal and vaginal intercourse." *Id.* It found that the "additional, early, documented disclosure would have provided

important additional corroboration of Victim's allegations, if the BCC records had been introduced in evidence." *Id.*

Second, the state court found that Victim was not entirely asymptomatic at the BCC visit and had abdominal pain, vaginal itching and discharge, and pain on urination. *Id.* The state court determined that "[p]articularly in the context of a young child who may not articulate concerning symptoms they are experiencing, we believe a jury could easily find that the symptoms Victim reported during the BCC visit were generally consistent with those identified in her first SAFE examination." *Id.*

Third, the court noted that the BCC examination occurred at a "walk-in urgent care clinic," and it found that the jury "could reasonably give diminished weight to this examination, given that it was not conducted by individuals specifically trained to address sexual abuse allegations." *Id.* 31. The Court also found it significant that the doctor who conducted the examination was not called to testify at the post-conviction evidentiary hearing, so it was unclear how extensive her examination was or how much weight her failure to note physical findings should be given. *Id.*

Fourth, the court found it significant that the first SAFE examination on July 15, 2013, did not conclusively identify physical indications of abuse; instead, the nurse who conducted the examination testified that her physical findings were "inconclusive" for abuse. *Id.* The court also noted that although Dr. Monroe testified that Victim's observed injuries were not the result of accident, she likewise did not definitively opine that those injuries had been caused by sexual abuse. *Id.*

The Missouri Court of Appeals concluded that there was no reasonable probability that but for trial counsel's failure to offer the BCC records into evidence, the outcome of the trial would have been different.

As with Ground One, Petitioner does not specify which of the three possible bases for habeas relief he relies on; the Court will consider each.

> i.    Whether the decision was on Ground Two was "based on an unreasonable determination of the facts"

Petitioner makes two challenges to the state court's factual determinations. First, Petitioner challenges the state court's finding that the BCC records contained additional evidence of disclosures that would have corroborated Victim's allegations if introduced at trial. Petitioner argues that the disclosure of vaginal touching in the shower was not mentioned in Victim's later disclosures and thus did not "corroborate" the later disclosures.  Petitioner also argues that it is not certain that the evidence of the vaginal touching in the shower would have been admissible, because it related to a crime other than the one charged. The Court finds the Missouri Court of Appeals' factual determination reasonable and supported by the record. Even assuming, *arguendo*, that the report of the vaginal touching in the shower did not corroborate Victim's other allegations and/or would have been inadmissible, the Missouri Court of Appeals' finding that these records contained disclosures that would have corroborated Victim's allegations at trial is still supported by the notation indicating that Victim "stated without prompting from the grandma that her dad took her to the living room and put his 'pee pee area' in her butt and her 'pee pee area.'" That disclosure is clearly corroborative of Victim's allegations.

Second, Petitioner argues that the Missouri Court of Appeals "erroneously found that the findings of Dr. Eden were not inconsistent with the findings of Ms. Walters"," emphasizing the differences in the two providers' physical findings. Traverse, ECF No. 25, at 20-21. However, this argument is misplaced because the Missouri Court of Appeals did not state that the providers' *physical findings* were consistent; it addressed only the consistency of the *symptoms* Victim

27

reported to the providers.[5] The statements the Missouri Court of Appeals made about the providers' physical findings are reasonable and supported by the record. The court stated, "[T]he SAFE examinations did not conclusively identify physical indications of abuse. Walters, the nurse who conducted the SAFE examination on July 15, 2013, testified that her physical findings were 'inconclusive' for abuse. Although Dr. Monroe testified that Victim's observed injuries were not the result of accident, she likewise did not definitively opine that those injuries had been caused by sexual abuse." *Id.* at 31. These statements are supported by the testimony these providers gave at trial. *See* Resp't Ex. A, at 186-87; *id.* at 208-210.

For the above reasons, Petitioner has not shown that the Missouri Court of Appeals' decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

>    *ii.* *Whether the decision on Ground Two was "contrary" to clearly established federal law*

Petitioner offers no basis for a finding that the Missouri Court of Appeals' decision on Ground Two was "contrary to" clearly established federal law, as established by the Supreme Court of the United States, nor does the Court find that it was. The Missouri Court of Appeals properly identified and articulated the rule set forth in *Strickland* and applied it to Petitioner's claim. Thus, Petitioner is not entitled to relief on this basis.

>    *iii.* *Whether the decision on Ground Two involved an "unreasonable application" of clearly established federal law*

The Court next considers whether the Missouri Court of Appeals' decision involved an unreasonable application of *Strickland*. As discussed above, to meet the "unreasonable

---

[5] Petitioner does not challenge the Missouri Court of Appeals' findings related to the symptoms Victim reported.

application" standard, a " prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn*, 592 U.S. at 118 (2020) (quoting *Richter*, 562 U.S. at 103). Additionally, "[b]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Shinn*, 592 U.S. at 119 (quoting *Knowles*, 556 U.S. at 123).

Petitioner argues that there is a reasonable probability that the outcome of Petitioner's trial would have been different had trial counsel obtained and used certified copies of the BCC medical records. Petitioner argues that with these records, trial counsel would have been able to impeach Ms. Walters' testimony that Victim had abnormal physical findings with an examination performed three days earlier (but still after the alleged abuse) that contained no abnormal physical findings. Petitioner also argues that the absence of findings in the BCC examination would have bolstered Petitioner's defense that there were alternative explanations for any abnormal findings in Ms. Walters' examination. Petitioner further argues that with these records, Petitioner could have cross-examined Dr. Monroe about how an early, normal examination would have impacted her opinion that even though Victim's examination was normal two months after the abuse, sexual abuse could still have occurred because children heal quickly. Finally, Petitioner argues that with these records, Petitioner could have seized on Dr. Monroe's statement that the best time to find evidence of abuse is as soon as possible after an alleged assault and could have highlighted the lack of physical findings at the time closest to when the assault was alleged to have happened.

The Court acknowledges that the evidence and argument offered by Petitioner could have supported a finding of *Strickland* prejudice from trial counsel's failure to obtain the BCC records. However, the Court cannot say that the Missouri Court of Appeals' contrary conclusion was unreasonable. The state court offered several good reasons for its conclusion, supported by the

record, including that the BCC records could themselves have been harmful to Petitioner's case by providing additional corroborating evidence that victim disclosed abuse without prompting and well before the allegedly problematic interviews with Eibel; that the examination findings offered at trial did not conclusively show physical abuse (lessening the importance of those findings and thus lessening the impact that impeaching those findings with the BCC records might have had on the outcome of the trial); and that the jury may well have given diminished weight to normal examination findings made by a an urgent care doctor with no special training in sexual abuse examinations. In light of these considerations, it was not unreasonable for the Missouri Court of Appeals to determine that there was no reasonable probability that, but for trial counsel's error, the result of the trial would have been different.

For all of the above reasons, Petitioner has not shown that the Missouri Court of Appeals' finding that he was not prejudiced under *Strickland* by his counsel's failure to obtain the BCC records was contrary to clearly established federal law, was an unreasonable determination of clearly established federal law, or was based on an unreasonable determination of the facts. Because Petitioner cannot establish the prejudice prong of *Strickland*, he cannot prevail on his ineffective assistance of counsel claim, and the Court need not address the deficient performance prong of *Strickland*. Ground Two will be denied.

## IV.    CONCLUSION

For all of the above reasons, Petitioner is not entitled to federal habeas relief. Under 28 U.S.C. § 2253, an appeal may not be taken to the Court of Appeals from the final order in a 28 U.S.C. § 2254 proceeding unless a circuit judge or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). To grant such a certificate, the judge must find that the Petitioner "has made a substantial showing of the denial of a constitutional right." § 2253(c)(2).

"A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (citation omitted). The Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right, so the Court will not issue a certificate of appealability. Accordingly,

      **IT IS HEREBY ORDERED** that Petitioner's Amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 9) is **DENIED.**

      **IT IS FURTHER ORDERED** that this case is **DISMISSED.**

      **IT IS FURTHER ORDERED** that no certificate of appealability shall issue because Petitioner has failed to make a substantial showing that he has been denied a constitutional right. 28 U.S.C. § 2253.

                                       _____
                                       SHIRLEY PADMORE MENSAH
                                       UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of March, 2025.